We're back on record for the final argument of the week, actually, 23-55770, Heckman v. Live Nation and Ticketmaster. We're ready to hear your argument. I'm just going to be rustling papers here for just a minute to get set up. Okay, I'm all set. Good morning, Your Honors. May I please the Court? Roman Martinez for Live Nation. I'd like to reserve three minutes for rebuttal, with your permission. Sure. Your Honors, plaintiffs in Live Nation have always agreed to arbitrate any disputes that arise between them. Plaintiffs are now asking you to nullify that agreement and force Live Nation into court. You should reject that for two overarching reasons. Number one, the agreement to arbitrate here was not unconscionable. And number two, any problem with New Era is easily fixed by following the contract and sending the case to fair claims or to a mutually agreed arbitrator. That's what the parties agreed. Live Nation switched to New Era here for a legitimate and valid reason. But that's my problem with your first argument. You had one deal, you've changed the deal, and if this one doesn't work out, you want to revert to the original. Oh, no, I'm sorry, Your Honor. That's not quite our argument. We think that the new deal, the deal that was agreed to, that all the parties read and agreed to after July 2021, that new revised agreement itself says that if New Era cannot do the arbitration, then the claim, the cases are arbitrated by fair claims. And if fair claims can't do it, then you go to a mutually agreed arbitrator. The old agreement said it goes to jams. So that's our other backup argument. But I think given that the parties agree, the basic structure of this agreement was, number one, we want to arbitrate any claims, and then here's the three different options for who arbitrates. Okay. So I think we're miscommunicating. It's not going to matter very much because we've read your briefs, and maybe I should just get out of your way. But I do want to have one preliminary question. So there's the New Era agreement, and then that has been amended, but we're just talking about the original New Era agreement, right? Yes, I think that's right, although we do think that the amendments which were made as New Era explained to clarify what the original rules had always meant, we think those can bear on the meaning of the original rules. But we think that what's before you is the original set of rules. And so I think just to kind of re-emphasize the point, we think that if we're right as to New Era, then there's nothing unconscionable here, and we should just go right to New Era. But even if we're wrong as to New Era, there's a severability type analysis that you can do, and the contract itself points the way to fair claims, not to go back to jams, which was the pre-July 2021, but rather fair claims. We think that's the best approach. I appreciate that. I think we're miscommunicating, but it's probably not worth the minute we spent on Well, let me just jump right in, because I do think that the heart of the dispute, and maybe the hardest issue for us, possibly for the other side too, is really what is New Era's rule? What do those rules mean? What do they do? And especially with respect to the issue of precedent. And I think there are two sort of sub-issues there. Number one, is precedent binding and mandatory, which is what the other side says? We think that New Era's rules are not binding and mandatory, and we think Judge Wu agreed with us on that. And then secondly, even if we're right that the rules are not binding and mandatory, do they nonetheless give the arbitrator too much discretion as to make them unconscionable? And that's where Judge Wu disagreed with us. He said, look, if you're right that the rules are not mandatory, you can't give this much discretion to the arbitrator, and that's the unconscionability problem. And so let me say a word about each of those two points. With respect to why the rules are not mandatory, I think that there's some ambiguity in these rules. It's probably inevitable, given that they were written, they hadn't yet been applied. And inevitably, if you're writing some rules and you haven't had a chance to have them sort of liquidated by practice, there are going to be some things that aren't perfectly clear. But we think the rules are clear enough and show, and in particular, I would refer to the court to rule 2Y sub 1. I think there, it's very clear, or clear enough, that the precedent rule has to be applied in a discretionary way. It says that the arbitrator may apply precedent. And then I think that's reinforced by the later rules, rule 6B35A and B, which says that precedent is applied as determined by the arbitrator. This is kind of classic discretionary language. We think that's why Judge Wu agreed with us that the rules governing precedent are not mandatory, they're not binding. Now, Judge Wu ended up disagreeing with us on the second point. He said, even if the application of precedent is discretionary, that's still a problem because you're giving too much power to the arbitrator. And presumably, what he thought was that the arbitrator would just have free reign to abuse its discretion that had been granted by New Era's rules. But we think that analysis is just squarely in conflict with this court's law and with the FAA and with California law, which say that when an arbitrator is given discretion, courts need to assume that the arbitrator is going to operate in a reasonable manner in conformity with law. And that's a direct quote from the Publon case from 2017, which was itself citing and embracing the rules set forth by the California courts in the Dotson case. So point number one, precedent is not mandatory and binding, and therefore, there's no problem. And point number two, there's no problem with too much discretion because we have to assume, especially at this stage, that the arbitrator is not going to abuse its discretion. And I think if you end up agreeing with us on those two points, really the rest of the argument becomes much easier, because I think the other objections that have been raised on both substantive unconscionability and procedural unconscionability just don't hold water. I'm happy to talk about any of the – there are a lot of these different provisions, but we think their arguments on those other points are just far weaker. For example, the limited appeal right. The other side points out that the terms of use say that you can appeal denials of – the grant of injunctive relief, but not the denial of injunctive relief. That sounds inherently wrong. I mean, one side gets to appeal, the other side doesn't? Well, the California Supreme Court addressed this in Sanchez and said that that was not unconscionable. But more importantly, Your Honor, it just doesn't have any bearing whatsoever on the delegation clause, which under the Supreme Court's decision in Renta Center is the proper unit of analysis here. We have to look at the delegation clause, and no one's asking for or getting an injunction when you're just trying to figure out whether the agreement to arbitrate is enforceable. No one gets an injunction on that. Well, wait a minute. Can we back up about the Renta Center and the delegation clause? Because I've looked at this carefully. You were right. It's not perfectly clear, and many provisions seem to me to be circular and problematic. So I'm going to talk to you about the front end of the flowchart before reaching the precedent that you started with. Sure. But on this point that you just raised, the threshold issue, the delegation clause, I mean, it's packed into the 10-page brief, right? That's at 2 ER 175. All the issues have to be in one briefing? No. I just don't think it's right that it's a 10-page brief. And so I would refer... Well, wait a minute. The first question, forgive me for interrupting, but the antecedent question is, it's one brief, right? They have to put their argument regarding the delegation in the same brief. I think it would be in the initial submission, the initial uploads of initial arguments and evidence, which is 250 pages that you get to do that. Well, I'm talking about their argument, not their exhibits. I'm talking about their argument. The only other vehicle I see is a messaging app. I agree with you, Your Honor. I think the 250-page limit, 10 files, 250-page limits, applies to the initial arguments. And you can see that on page... You know, you say 250 pages and you say that in your brief, so I think I'm missing something because there's the briefs and then there's their uploading, basically their evidence. Can I walk you through it just to show you how I get there? Yes. Okay. So I'm looking at page 189 of the excerpts of record. So you have to do it a little differently. Is it 2ER189? 2ER189. Okay. Okay. And there we're looking at Rule 6A, Sub 7, and it says parties upload their documents. Parties upload supporting documents limited to the lesser of 10 files or 25 total pages. Right. But if you look two points above that, that was point three, point one says both claimants and respondents upload the relevant documents and their initial arguments. Yeah. So documents and arguments. Then you go to the point that you just read that the uploads, the uploads of the documents and the arguments are limited to the lesser of 10 total files, 25 total pages for each file. So 10 times 25, that's 250 pages. That covers both your evidence and your initial arguments. So I think 250 pages to make your initial arguments about arbitrability is more than enough. How long can your brief be? How long can the brief be? The brief can be... You can... You could submit no evidence and just a brief of 250 pages? Yes. Under these rules, you can. It says initial arguments and then it says 250 pages. That's exactly what it says. As long as you're willing to have no evidence. Right. But that's why... Okay. But Your Honor, just to be clear, of course, in most cases, you would submit a much shorter brief and have more evidence. And if you needed more space, you would just look at provision, Sub Provision 7-4, which says that the neutral has discretion to allow evidence in excess of the stated limits as necessary to ensure a fundamentally fair practice. So say that you want to submit a 50-page brief with your arguments... You know, that's a really cockamamie way to set up a system where you don't have a page limit on briefs and then a separate thing addressing documents. Who wrote that? Well, New Era came up with these rules and I think what they thought... I asked you who wrote that. Who did? New Era. The company wrote that. And so they came up with the rules and they decided for whatever... Was it a lawyer who wrote that? I think that evidence shows that the founders of New Era collaborated in writing the rules and some of them were lawyers. Because if you're trying to tell me as a practitioner or somebody coming into this, here's how long your brief can be. Here's how many exhibits you can have. Here are the page limits for your brief. Here's the page limits. This is drafting malpractice. Your Honor, fair enough. I think there are some ambiguities here that had to be clarified over time and the company has tried to clarify them. It's just nuts. I don't think it's nuts to say that you have 250 pages as a kind of baseline default rule to submit your evidence and make your arguments about enforceability. I don't think that's nuts. I think if you and I were drafting it, I think we would make it a little bit clearer. A little bit? There we go. We would have a separate limit for the briefs. We'd have a separate limit for the evidence. Maybe we'd do it differently, but that doesn't mean that the way they did it is unconscionable. Anybody who practices law would be accustomed to, here's your briefing limit, here's your exhibit limit, instead of mushing them together this way. Fair enough, Your Honor. I agree with you on that, but I don't think that the act of mushing them together is unconscionable because once you've mushed them together, you still get 250 pages to make your arguments and to submit evidence. Can I take you back to the top of my flow chart? 2AR177, because I've really looked at this and tried to figure it out, and I know my colleagues have too, and there's this batching. It says, claims presenting combinations are batched into mass arbitration by the parties selected neutral or by the new era neutral. One or the other? Sorry, can you repeat that one more time? You bet. It's 2AR177. Yeah. Claims presenting common... Your day is going to get better a little later. I see the look on your face, but I really am trying to understand this here. Claims presenting common issues are batched into mass arbitration by the parties selected neutral or by a new era neutral. Okay? Right. Then, there's another provision at 2ER191. It doesn't say that it comes second, but it's farther into the agreement. Parties participate in the rank and strike process to choose a neutral. Okay? And then, it says the plaintiff's lawyers must reach a consensus to participate in the rank and strike process. So, to the extent we're talking about lawyers, plural, and consensus, which implies plural, right, the batching has to have already happened, because it's the batching that indicates who's at the table. Right? I think the batching that you're talking about is when the new era is initially... It's at the very top of the decision tree. ...one law firm or a couple of law firms working together. And it says, we're going to put these into mass arbitration. And then, it says, okay, we're going to pick the bellwether. We're going to resolve the bellwether cases first. We've got to pick a neutral. And then, it does the rank and strike process, whereby each side, the plaintiff's firm that brought the mass arbitration on one side, and then the defendant on the other, does their rank and strike. And then, you choose an agreed arbitrator. I understand all that. Okay. Here's my question. We'll start again. It says, 2AR177, claims presenting common issues are batched, I'm paraphrasing. Right. Right? And that process is either the party's selected neutral, right, or by new era's neutral. So, it's either one of those. But I think it's always going to be new era's neutral. I think it has to be, because of this other provision at 2AR191. And this is an invitation, truly, honestly, for you to tell me what I'm missing. This says, the parties participate in the rank and strike process that you just described to choose a neutral. Right. I think that's... We're not there yet, counsel. And the question is, the party's lawyers, plural, must reach a consensus to participate in the rank and strike process. So, my point is, reading these together, it seems like the first provision is, is this an empty promise? The lawyers, the batching process is what determines who the lawyers are that are at the table. No, I think the batching process is what, I think what that other provision is getting at is, is that the decision to put the cases in the first place into the mass arbitration. Yes. That's done by new era, based on its understanding, when a lot of cases are filed that look identical. It doesn't say it's done by new era, counsel. It says, either by the party's selected neutral, or by new era. And what I'm pointing out is, since we're talking about clarity and continuity, and is this fair? It seems to me, making a promise here, that it cannot deliver. I, Your Honor, I think, I, I... It just contradicts itself. I think if you concluded that these provisions as a whole were ultimately unconscionable, I think we should shift to the second part of the argument. Because... Well, I'm not done. Okay. Please. I, I really want to make sure that I've got this right. Do you see a way for the parties to participate in selecting the, their neutral? Yes. Okay. I'm waiting. So, I think there's a rank and strike process by which, when, when the, when they're figuring out who the neutral is going to be, each party gets to eliminate one of the, the options that new era has given them, and then they get to rank the others, and then... So, each party, to say that each party is at the table and the plaintiff's lawyers have to vote, basically, in the rank and strike process by consensus, right? Those party, those lawyers are selected. That subset of lawyers is a function of what got batched together, what issues are, are at stake. Right. But the ones that got batched together are going to be when the cases are all involving the same claims and are brought by the same lawyers. Which, which new era has determined, is my point. Which... The top of the decision tree, that's new era, and it's got to be only new era. It, it's, it is, it is new era, although later parties have an option to explain why their cases don't... Okay, hold on. We're almost there. Thank you. The batching decision is not appealable, right? That's right. Okay. And so then you... Can I, can I caveat that? You bet. The initial batching decision isn't appealable, but if, if a party believes that they have a case that shouldn't be in the mass arbitration... Right. Because their case doesn't raise common issues of law and fact, then later they have the option, after the bellwether cases are resolved, to say, take us out of the arbitration. Right. And I was, and thank you for that, and don't worry, we're going to give you more time, because I'm taking so much of it, but I, but this is, this is a related problem. I'm just trying to follow the flow chart, right? They do have that option. It says that they do, but the, the, the decision's not appealable, and it's critical, right? Because there is an option for precedent to be invoked, and I'm trying to figure out how any of that would work in real life, because the process is confidential. Oh, so let me try to... I don't know what went into that decision. So the, the whole theory... Excuse me. Sorry. It was a bit of a rhetorical question, and it wasn't a very good one, so I give you a chance to answer both parts of it. It's, it's, it's a confidential process at the top of the decision tree that batches the issues which is critical, and it's confidential as to their team, but, but never to the defendants. The defendants will, will know what issues and facts went into those briefs and those earlier precedents. So now get out of your way. All of, all of the parties to the mass arbitration, all the cases that have been batched in together will know what the, what the precedents are and what the... All the cases that have been batched in together. That, that are put together into the mass arbitration. Yes, and those are the... And who is going to make that batching decision unilaterally? It's going to make it unilaterally on the front end, but then it's going to give the parties the ability to, to, to persuade the, the arbitrator that their case should not be part of the mass arbitration. Yes. But, but just to go to your... Can I answer your notice question? Yes. Because I think it's important. No, no party on either side is ever going to be in a situation where they're not going to have notice of the, the precedents that may be applied to their case. Why not? Because the whole theory of this is that the precedent only applies within the mass arbitration. So once the bellwethers are decided, then the next step in the process is that there's a mediation conference where all of the, the individual claimants who were not part of the bellwether cases, the, the whole point of the bellwethers is to kind of demonstrate how these cases might get resolved. So all of them get to see how the bellwethers came out and then they get to decide to participate in a settlement or not. If they don't want to settle, then they can make an argument to the arbitrators that their cases are different from the bellwether cases or that they want to make new arguments or put forward new evidence. And if they do that, then under New Era's view, the precedent is not binding, then they will have the opportunity to make those arguments in their own name to the arbitrator. And so they will have both notice and an opportunity to distinguish themselves or take them out of the realm of precedent. I don't think so. I don't see where that comes in, in, into this flow chart. The process is confidential. At the back end, after the bellwethers, there's no, you're shaking your head no, but there's no provision for them to even have a hearing after that. No, no, that's not right, Your Honor. And, and, and relatedly? Well, well, there's no requirement that there be a hearing. No, there's an opportunity expressly set out in, in the rules that, and this is at, at 2X sub 3 and 6B3 4D, that after the hearing, after the initial case, you, you, Is that the bellwether? After, right, after, after the hell, the hearing and the bellwether cases, parties have an opportunity to explain why their cases are different and shouldn't be set. Well, that's the problem. When you say the parties will have that opportunity, that's what we're getting at. So a new claim, right? Like a later filed claim? Uh-huh. Won't have a, a, a, won't have an opportunity because in any other place in life where a lawyer, a lawyer is trying to explain why precedent shouldn't apply, the lawyer has an opportunity to know what facts and arguments were made. So, Your Honor, if the new claim is put into the mass arbitration, then the whole theory of this is that they would see the, the result of the bellwether case. I'm talking about new claims. If new, if a new claim is filed and it's put into the mass arbitration. If it's not put into the mass arbitration, then precedent is not going to apply, so no one's going to be bound by anything, even persuasively. Um. If it is put in, then you're going to have an opportunity to say, our case doesn't raise common issues of law and fact because we want it, we have different evidence, we have different witnesses, we have different experts, we have different legal arguments, we want to be treated differently from the bellwether cases. So, whether you're in or outside. And if the arbitrator, the neutral agrees with you, disagrees with you? And if the neutral says, no, I've looked at your arguments, we don't think they're persuasive, I think your case is identical to the ones that I've already resolved, and then that, and that's the, the circumstance in which you could. Where does that argument get made? You make that argument after the bellwethers are resolved, after the mediation conference, when a party says, I don't want to mediate, I don't want to resolve this by settlement, and I want to go forward on my remaining case. Where in the rules does it allow me to file a brief? So. A hearing, a request to hearing. It would be at rule, rule 2X sub 3 and rule 6B34D. Both of them let the parties present arguments and evidence after the bellwether that their cases don't raise issues of common, common issues of law and fact. Which means, under New Era's understanding of its rules, that you can raise new arguments, new evidence, new legal theories, and at that point the arbitrator has to decide whether it thinks your arguments are persuasive enough to distinguish you from the decision in the bellwether cases. But that is an intermediate step. I agree with you it could be spelled out more clearly, but it's definitely an intermediate step that lets you do that. Your Honor, can I, I take it there may be some concerns about New Era's rules not being totally clear. I think you're right. Can I pivot then? Not quite yet. Okay. I'd like to ask a question about, and then I'll try to get out of your way a little. I know I keep saying that. 2AR153 is the Declaration of Live Lations Litigation Coordinator, paragraph 7. And this is a specific point, but again, I'm trying to figure out how this works. This tells us that Scott Heckman used a mobile device, mobile site, to purchase tickets the day before the new rules were announced. So he's got a ticket in his account, and I'm envisioning a bar code that he's going to access with his phone when he wants to go to the concert. Is that a fair assumption? I don't know the answer, but that sounds right to me from my experience. From all the concerts that you've attended? Yes. Me too. I don't go to very many either. But I think that's right. And so I'm worried about what constitutes under the terms of use, continued use of the site. Because if Mr. Heckman had a ticket in his account, it seems to me that in order to use it, he's got to go in there and access his account. Does that constitute? I don't think that's implicated. So would doing that constitute a continued use of the site? I don't think that's implicated in the case, because I don't think that we're relying on continued use as a basis for binding Mr. Heckman or any of the other plaintiffs here. Our theory in this case is that they were bound because they bought tickets after July 2021. And in order to buy those tickets in the first place, they had to check a box that certified that they had read the rules, including the new rules that said that New Era was going to conduct the arbitration. So this idea that we're relying on the continued use in some sense and that that's an important feature of the case, respectfully, I don't think it is. It's very important to me, because it's not presented in the briefing consistently. So some places it talks about, I think both briefs, I'm not pointing the finger at you. I don't know, really, if it means that I buy into these rules when I visit the site before I bought a ticket. I think that we would say that you buy into the rules under California law when you visit the site and when you check the box saying you've read and accepted the terms. Do I have to check that box in order to just browse, or do I have to check that box in order to go into my account? I don't know if you have to check it just to go into your account, but you certainly have to do it when you buy a ticket. And then the third question is I'm sure I have to do it when I buy a ticket. Right, and that's what all the plaintiffs here have done. That's my question about Mr. Heckman. He already had a ticket in his account sitting waiting to use, and I think under this theory he would have to check the box in order to use the ticket he already owned, but that's what I'm not sure of. I don't know either, but I think that it doesn't really matter because Mr. Heckman subsequently bought a ticket where he checked the box agreeing to the arbitration agreement that's currently at issue in front of you in this case. So we think that the whole question is very hypothetical and speculative about how this might apply to someone else who is just browsing. Here all of the plaintiffs have expressly agreed to these particular terms of use by New Era. I couldn't hear the last thing you said. That's okay. They've agreed to the terms of use by what? Terms of use which include arbitration by New Era. So there's no unilateral modification issue in this case because the modification here was bilateral. We put it in writing. We gave it to them very clearly. We gave them the text that said New Era. We gave them the hyperlink to the New Era rules. They checked the box certifying that they had read this and agreed to it. The difficulty with that argument, and then I really will wait and listen, is that when you say they gave it to them very clearly, I've spent a week on this going through it, and my notes are full of a flow chart with arrows going back and forth in circles. It's very hard to understand. So I think the clearest place is if you look at pages 111 to 114 of the second volume of the ER, and I think it has the pictures that say that you have, you know, I'm looking at page 113. There's a diagram. It says I have read and agreed to the current terms of use, and then you have to check it and you have to click the box to place the order. And it's total fantasy land to think that they've actually read it and understood it. Your Honor, I think that's— I'm just telling you the truth, and you know it too. I think that as a matter of law, the way that the law treats the situation is— You're talking law and I'm talking fact, but I understand the law. Okay. But to actually think that they've read it, understood it, and agreed to it is fantasy. I think that as a matter of law, it's not fantasy. It's the way that the law, as you know, Your Honor, work both in this circuit and the Supreme Court, and courts have repeatedly upheld these types of click-through arrangements. I think that's right. I'm going to give you that. I'm spotting you that because I think that's clear, and I think Judge Fletcher—that was baked into his point. But what I'm telling you is I'm assuming they did read it. I've read it. I find it enormously complicated. Okay. I think the question— And internally contradictory. I think the question on that is how much do they have to be aware of or how clear do the rules have to be? I think on the point that the delegation was shifting from jams to new era, it's 100% unambiguous. Anyone who just read the terms of use would have known that it was being done by new era. Then you get to the question of, well, were new era's rules ambiguous? You spotted me something. I'll spot you one right back. I think that these rules could have been written a lot more clearly. We're not here to tell you that they couldn't have been done better. I think the question is whether the ambiguities there are unconscionable. And I would say no because I think there's a general principle of contract law that when there are ambiguities, you try to resolve those ambiguities and construe those principles in a way that makes the contract lawful and effective. That's what the Poublon case said. I'm going to interrupt you right there because I have a question about this batching. For me, it's very important that the funneling at the top of the decision tree is batching these and then off to the races until we get to the precedent. That decision, I think, is really critical under this process. At 2AR175-178, the promise is made that the litigants will have an opportunity to participate in that decision, and I cannot see in the rest of the flow chart how that promise is fulfilled, and it seems to be that the other provision I read to you makes it pretty clear it can't be. So what do I do with that? Let me try one more time, and if I can't give you an answer that satisfies you, maybe I can talk about the back part of my mind. I think your answer is going to be that at the back end they'll have an opportunity. Exactly. But my question is different because it's at the top end. It makes this representation. I'm assuming that I clicked and I read it, that I'm the one in a jillion person who did that in my hypothetical and was trying to understand it, and I understood that I was going to have an opportunity to have a say-so in the batching at the top of the flow chart. Okay, I don't know. If I think that's wrong and contradicted, what do I do with that? If you think that a reasonable person reading this would have thought that they would have an opportunity at the top of the flow chart to unbatch themselves, then I think that the contract is unclear and maybe it's unconscionable. Not to unbatch themselves, but to participate in the batching. Right. If you thought that the contract communicated that, I think that that would be misleading and surprising to the reader, and then I think we would go to our backup argument perhaps about severability. I just don't think that the contract actually would give the person the impression that at the front end, before the bellwethers are conducted, you have an opportunity to unbatch yourself. And I don't think it matters that it happens at the back end. Again, I'm not talking about unbatching. I'm talking about participating. My lawyer gets to participate in the decision to decide what gets batched, and I think under this provision that's not correct, that only Nuair is going to do that unilaterally. Again, Your Honor, if you think that that is what the contract promises and then it doesn't deliver because the rules are misleading, then I think we should talk about my severability argument. Okay. I would like to give my colleagues a chance to jump in here. Do you have additional questions? I'd like to hear about severability. Go right ahead. Thank you, Your Honor, and I appreciate the hard questions. As I said earlier, I concede that these rules could have been written more clearly, and I think, frankly, we all wish they had been written more clearly. It would make your job easier and probably mine as well. I think with respect to severability, though, I think that part of the case is relatively straightforward, and I'd like to emphasize three points. Number one, the parties expressly contemplated that there was going to be a world in which Nuair, with all the complicated, ambiguous rules that we've just been talking about, wouldn't be able to do the arbitration. And the parties agreed in the contract that if that happened, that the case would then be sent to fair claims, number one, or number two, to a mutually agreed arbitrator. And here no one has ever made an argument that fair claims has the problems that we've been talking about with Nuair, and, in fact, they don't. They don't have a precedent rule. The rules on discovery are much broader. The rules are clearer, and they give the arbitrator more expressed discretion to do things, you know, in the interest of justice. So no one has argued that the party's designation of fair claims as the backup arbitrator is unfair. Judge Wu below held that failure of the other side to challenge fair claims against us. So they essentially had the opportunity, because we raised it three times in our motion to compel arbitration, in our reply brief, and in our supplemental brief. We said, hey, if Nuair is not good enough, you should send it to fair claims. And they had every opportunity to say, no, no, no, you can't send it to fair claims. Fair claims is bad and unfair and unconscionable for all these same reasons. They never did that. No complaint, no charge, no accusation has been made against fair claims here, including in this court when we made the same point in our brief. Now, all of the core disputes that we've been talking about today, and I think the vast majority of what they're citing in their brief, all these problems are specific to Nuair. So just as a matter of common sense, not just the contract, but common sense, if the problem is Nuair, then the solution is to take Nuair out of the equation and follow the party's agreement and go to the backup arbitrator. We understand. You've doubled your time. May I ask a follow-up to that? Yes, please. So I think we know your argument. We've all read your briefing, obviously, so we understand your argument there. A specific question I have is let's assume, for the sake of argument, that I think that Nuair's mass arbitration approach just doesn't fall under conception. So Discover Bank springs back into life, and so how does that affect your this should go to fair claims argument specifically if instead of the big procedural and substantive unconscionability, you just get to Nuair's thing is knocked out by Discover Bank. What happens then? Do you go to fair claims under your view? I think you would still go to fair claims because I think the Discover Bank question. I hope he's listening because I have that question for him. I think the Discover Bank question is a question that goes to the potential unconscionability of the arbitration agreement as a whole. Which is a shortcut to get to unconscionability without 20 minutes. Right, and so I think that's the question that was delegated to the arbitrator. But it does seem a little weird that you make a play to do something that California law says is unconscionable. The FAA doesn't cover it under this theory that I'm saying. The FAA doesn't preempt that. And then you get to have a backup that goes back into the old world. There's something about that that seems kind of wrong. Well, I think the threshold question is what does the delegation clause require? And is the delegation clause unconscionable? And I think the Discover Bank argument, which I'm happy to talk about on the merits because I do think it's foreclosed by Concepcion. I don't think that argument speaks to the delegation clause. And therefore, it's just not part of the equation for this court. Now, maybe they'd have a good argument. And if there was someone who had the view that Discover Bank survives and that was the arbitrator, then that's what we'll have to fight out in front of the arbitrator. Let me ask you about that argument. That's what we were trying to get to a minute ago, and we went off in a different direction. I appreciate Ren Center's ruling. It's very clear. And your brief stresses that we have to be just looking at the delegation clause. But this goes back to the flowchart because it seems that you're trying to divorce those two things, but you've really required here that the parties put all of their arguments in one brief. And that brief is going to travel through this very same process. Right. I guess what I would say, though, is that the question for this court and for the district court below is still limited to whether the delegation clause is unconscionable. And I don't think that the Discover Bank argument means that the delegation clause specifically is unconscionable. Anything further? Okay. We're going to hear from opposing counsel. For planning purposes, we took you so far over. For planning purposes, we'll put four minutes on the clock when you come back. Thank you, Your Honors. Thank you for your patience with our questions. Good morning, Your Honors. May it please the Court. You put 30 minutes on the clock just to start? No. There's a lot there I'm very eager to address. If I could just start with three quick points, hopefully. I just remind the Court that New Era won a motion to compel before this same judge, against the same opposing counsel, on a virtually identical complaint that would have sent these cases to bilateral traditional arbitration jams. I think that shows two things. Despite insinuations in the briefing, the judge in this case was not hostile to arbitration. And second, Live Nation saw real tactical benefit to be gained from the New Era rules, so much so that they were willing to put at risk facing a major antitrust class action. So it shouldn't be surprising that there is real advantage to them. The second point, Live Nation's briefs I view as repeatedly invoking a vague sort of federal common law type overlay over the state law standard, and Morgan v. Sundance ends that. Publon was before Morgan v. Sundance. They cited, I think, over 15 times in their briefs for this idea that they say you need to put a thumb on the scale when you're interpreting a state contract. Morgan v. Sundance ends that. This court noted it in Armstrong v. Michaels and the Voltage case, both very recently. Third. Can I try to bring you to where I think, assume you get to unconscionable, and my colleagues has a different one, but assume you get to unconscionable, whether you go the long, arduous procedural substantive or you just go straight to conception doesn't cover discovery bank. It felt like in your briefing that you have more limited treatment of a response to their, yeah, then you go to fair claims, and if you don't go to fair claims, we get jams back. And I'm curious as to your response to that and specifically if there's any difference if the way you get to unconscionability is through the conception discovery bank route or the longer route. Thank you, Your Honor. So it's a two-part answer. We do not engage with fair claims, and we didn't below, because we think the California test for severability does not require us to. Without this federal overlay, which I can speak to, the California test is very clear. You're looking at does the cause in question have repeated errors or unconscionable issues that cause the judge to believe this was intended by the more sophisticated party to stack the deck against the less sophisticated. If that's true, in the interest of justice, the court under California law can sever the entire thing. And when I say interest of justice, that's a general term, but there's a concrete practical policy point, which is if the rule were otherwise, defendants could stack from extremely, crazily unconscionable to very unconscionable all the way down to maybe we can get this one by a set of procedures and say, Your Honor, give us the most advantage you could possibly give us before you just can't take it. And the cases repeatedly say that when the judge sees that, they can take the whole thing down. So that's our first point. On Discover Bank, that argument absolutely runs to the delegation clause because if you have to raise your arguments in a mass joinder proceeding, which Viking River Cruise says is absolutely not what the FAA was contemplating, you have to raise your threshold arguments there, too. And you get all these issues that are very complicated. Concepcion and Viking River explain this. When you start getting into group proceedings, you have due process rights. You have people who join later and do not have a right to participate. And it changes the entire nature of the proceeding. So that all makes good sense to me, and your answer was very helpful to me. I want to springboard off of the last thing you just said. One thing that wasn't said by either side, and I think it's because it just feels like there's not really a doctrinal way to address this issue, but it occurs to me that there is a delegation clause here. If you delegate the Discovery Bank slash Concepcion issue or all of this or the long unconscionability issue to the arbitrator, what you're asking is for a new era arbitrator right on the brink of new era's new era. You know, super exciting moment, and you're asking this arbitrator to decide. This is supposed to be a legal question, but really you're asking this arbitrator to decide whether new era will continue to exist. The employer of this arbitrator, if this arbitrator decides that issue the wrong way, he just got himself out of a job. He just killed new era. I'm guessing even Jams isn't going to be interested in hiring this arbitrator because he just killed. And that hasn't really discussed by you, but that seems like a little bit of an elephant in the room to me. To ask, there seems like, I'm not a big fan of these due process-y type arguments and stuff, but it does seem like this is really asking somebody to decide something. It's just crazy to ask somebody. It's a conflict of interest, I guess. I absolutely agree with that and would add. And hopefully you're not going to listen to that. It's doubly so when new era, the employer, has in this hypothetical, would have been preceded by what they did in this case, which is coordinate ex parte with Live Nation to advocate on that precise issue. My question would be what doctrinally, you didn't really emphasize that, you emphasized the thing you're saying, but doctrinally what do I do with that? Do you just say, well, that's an exception to the fact that delegation, when you have a clear delegation clause that goes to the arbitrator, is there an exception to the exception for when the question you're asking to be delegated is just too much of a conflict of interest? I don't know. I think I understand the question. The way I would answer it is, as is often the case, these unconscionability arguments can be applied to the underlying issue or to the delegation clause. You've identified one that tends to run very directly to delegation because it's a conflict type unconscionability, substantive unconscionability ground, that would be unique to the delegation clause. Sometimes there's ones unique to the underlying. You would be delegating the issue of whether or not this is a permissible, this really sort of, I mean there's a reason we have the rock stars in here arguing this stuff, right? Because this is a huge issue that impacts a lot of people, and so you're delegating that one question to this one person where his decision will, his or her decision will affect whether they continue to be employed, whether this continues to go forward. It's just really hard. I would not feel if I was the person on the non-live nation side of this that I was probably going to get a fair shake. There are a number of elements that are uniquely. On that issue.  On that issue, do we have case law addressing that issue? How have those arguments fared that an arbitrator's bulk of work comes from JAMS or elsewhere, so he or she would be biased? The general arguments about JAMS and AAA have not fared well. I thought so too. But have we ever had cases where like literally you are deciding whether or not the entity that you are working under is going to disappear, going to go away? No, I don't recall it. Because effectively that's what they would be deciding here, right? If they were to decide that this is unconscionable mass arbitration, they would be killing New Era's whole business model. I appreciate the premise of the question that New Era's entire business model was sprung up to sort of serve as a prophylactic to mass arbitrations, and I agree with that. Because this is so unique and novel, I'm not aware of a case like that. But I think from first principles, thinking about what an arbitrator is being asked to do, that's an additional ground. While we're on delegation, I'll also note the district court, at the end of its opinion, ER 10, 11, and 29 went through and explained how each element that it was finding tied to the delegation clause. And under this court's decision in BLSGB Coinbase, they don't have to be separate from the underlying issues. It's fine if the same issues run to both. And on the point about the unilateral appeal, the district court addressed that in a footnote. Actually, there's two clauses in footnote 21, ER 29 to 30, and the court addresses injunctive relief and contract rescission, which I view as different, and says any injunctive relief awarded on the threshold issue of arbitrability would be subject to appeal, meaning it's subject to the delegation clause. And then in a parenthetical says it's not entirely clear whether equitable relief, such as contract rescission, how that would be treated for appeal. The opening brief at 43 splices those together and reverses them and says that the district court conceded that it's not possible any injunctive relief would be awarded on the threshold issue of arbitrability. So I just wanted to clarify. The district court made quite clear that it can. And this to me is entirely plausible. The California Consumer Legal Remedies Act creates a cause of action for injunctive relief to challenge or to enjoin an unconscionable contract. And so if we were in this scenario, we would absolutely seek an injunction on threshold issues. We're very concerned about mutuality, our case law is, and we've talked about that vis-a-vis the injunctive relief provision and the right to appeal. But what about the confidentiality provisions in this document? Well, it's sort of given the nature of what's going on here, structurally not mutual, in that parties, there's strict confidentiality. Well, I'm trying to figure out whether it is or not. I posited that. And what about, you know, it seems to me that there's a mutuality concern because the defendants are always going to know what arguments went into the briefs and so forth and what evidence there was. And my question to opposing counsel is why doesn't, essentially, that put plaintiffs, especially new ones, at a disadvantage because they're not in a very good position to distinguish themselves from precedent. But opposing counsel pushed back, and he thinks there would be an opportunity and that all cases batched together, I guess, even later added ones, would have access to those briefs and evidence. Is that right? Once they've missed out on a bunch and are stuck, I think it is right. But to spell that out, I think the confidentiality requirements would preclude counsel from telling later potential clients. What if I don't have a lawyer? The same. You wouldn't learn until you filed or if it was a different law firm.  The idea is that cases can be batched as mass arbitrations together even if there are different firms involved, which happens. Mass arbitrations are often prompted by some high-profile violation, and there will be a number of firms now who file them, some at different times. So it's very possible you have pro se litigants or litigants represented by different firms who would file later and, in the extreme form, come to find out their case is over. You've lost. You didn't get to make any arguments, and precedent shall be applied. I'm happy to talk at some point about the textual analysis of precedent because I think it's pretty clearly applicable in a mass arbitration context. So my friend cited Rule 2Y. That's the general definition of precedent. Rule 6B36 is the specific rule. The general says precedent may be applied. The specific says shall. I think when you have that contrast. Then that's not appealable. Correct. Well, it's appealable for Live Nation if they lose an injunction. Only if they've changed it. But not for claimants. And if there's any ambiguity, you know, they cite this. These are all right after each other in Rule 6B36. 3B5 says they will be. And then there's this language that they will be applied as determined by the neutral. I read that as just saying the neutral is deciding which cases have common issues. But once the cases are grouped, you have to apply precedent. If there were any ambiguity, 6B36 sets out a process that says the neutral will create a process for handling individual issues, but precedent will still apply to all common issues. So, again, you've got this contrast. And structurally, there's no reason to screen out cases and say, okay, let's talk about I've decided some big issues in this case. Come to me with the cases that you have individualized issues, and we can focus on them. And tell me the ones where there are no individualized issues. None of that makes any sense if you're going to say, but you get to litigate everything in all cases. I really think that this was intended to bind everybody. That makes sense if you think about the goal of how are we going to come up with a way to resolve all of this. And then when we started litigating, they realized, shoot, we didn't think this through. We've created a big due process problem. And they're running from the plain text of the rules. Your time is coming to a close. For my part, it would be helpful to hear your strongest, concisely hear your strongest severability argument. Do you think there's problems with contravenability? Yes. I think I understand another context of the law, this use a red pen intuition, and you've got to stop where you can stop with the red pen. That's not what California law calls for. California law calls for really policy-laden analysis to say, do we think this arbitration provision, and they do this outside of arbitration as well, was laden with enough terms that the intent here was really for the stronger party to get one over on the weaker one? And if so, they lose the benefit of that all. And there's no federal preemption overlay to that. That's the standard. I think the district court, it's an abusive discretion standard. It was well within its discretion to say, and it spelled it out here, that it was really, they easily could have done this differently. They didn't have to do this. And he read behind that. After three hearings, three tentative rulings, really thoughtful discovery, put a lot of thought into this long opinion and was very careful and measured in it, he concluded that he thought they were trying to get away with something here and it would be bad policy, which California law totally allows them to conclude, to give them the arbitration clause. If you have any further questions. Looks like we don't. Thank goodness they didn't give you 30 minutes. Thank you, Your Honors. I'd love to talk about Discover Bank and then about severability. First of all, with respect to the argument about Discover Bank, I think it's important to realize that the whole premise of the Discover Bank argument is that you have a situation in which it's not traditional bilateral arbitration. Right? That's the whole theory. But if we're right about severability, then the case would go to either fair claims or to a mutually agreed arbitrator, in which case it would be traditional bilateral arbitration. So the Discover Bank argument doesn't work if the case is going to. If you just do the Discover Bank argument and stop before you get to the, you know, as to the initial thing here, which is next January or whatever they're called, as long as you don't take that into account, then it's only when you, if you take into account the whole process and say, okay. Yeah, I think our view would be it doesn't speak to the delegation clause, so you wouldn't do the Discover Bank first. But even if you did, you would solve the Discover Bank problem because of the severability analysis because the severability would mean that it's going to. It depends on what order you're doing the argument. If you pull in fast track and jams as part of your Discover Bank analysis, if you let it go to the backup, then I see your point. But if you just are just analyzing first off whether or not I think Concepcion covers the main thing here, and then you were to conclude, you know, it just doesn't because I'm not saying that. But if we did conclude that, and then you go to the severability issue, you know, if you divide it up that way, then it. But then you would go to the severability issue, and you would realize that the severing New Era would solve not just, you know, the problems about the complications in New Era's rules, but it would also solve the Discover Bank problem. But what about their point? I mean, their point has some validity that that sort of approach encourages companies to stack up, you know, this is what we really want, the one where we have trial by combat. And then absent that, we're going to go through that. I think that's unfair, and I think their approach would actually make it impossible for parties to respond to changes in how firms on both sides are litigating or arbitrating these cases. And we were responding to a very legitimate problem. It would. So we can't ossify the law of arbitration and sort of hold people, you know, and make it so that if you have a foot fault, if you have a bunch of ambiguous rules, and that's going to mean that we're not going to enforce any arbitration agreement. Instead, I think the better thing to do is try to construe the contract to be lawful. If the rules are too ambiguous, too unconscionable, then okay, then this provider doesn't work. But when the parties say there's a backup, then apply the backup. But the challenge is you've got two different policy things. You've got the FAA's policy that's pro-arbitration. Right. You know, Sundance is an unclear word. But you have a federal policy that's pro-arbitration, and then you've got essentially a California policy that says if you try any funny business of trying to – you get like – I don't think that's – I don't think that's what California law says. Let's assume for a second, though, that that's California. I'm not – I won't make you agree that that's – but if California has a policy that says you get one bite at the apple, and if you're – if you try to have an unconscionable and you can't do backups, because that's not a crazy policy. It basically encourages companies to try to have – Just to be clear, that is not what California law says. They haven't cited a single case that comes close to saying that. Puban is the – Sounds like California to me, kind of. Puban is the binding precedent from this court that interprets California law on this exact issue. And what it says is you have to look to whether the contract as a whole has a lawful object. And it says that a contract that mandates arbitration has the lawful object of mandating arbitration. And I think the most reasonable way to look at this agreement is that the most important thing was we're going to send claims to arbitration. And then the party said – and here is a list of sort of in order of preference. First we go Nugira. Then we go fair claims. Then we go mutually agreed arbitrator. I think that's a good point. You say we're going to send claims to arbitration. They had a fair point to say just because you call something arbitration doesn't mean it's the – that's a very broad term. And if you – to use an absurd hypothetical – if you just call trial by combat a form of arbitration, and you say so that's our – we're going to do trial by combat and then we're going to do mass arbitration and then we're going to do some – and the problem with that is that that starts to feel like an actual policy. Instead of the policy being to send something to arbitration, it's to avoid courts. Like that's a – it's not – in other words, it depends on what level we set when we say there's a policy to – what the parties want to do is send something to arbitration. It depends on how we define arbitration. And if mass arbitration just isn't really the kind of arbitration that's reflected by – that the FAA is trying to protect at all. Can I answer this question and just give two case citations? I know I'm out of time because I wanted to respond to an earlier question that came up. Go ahead. So just with respect to this question, I think the mass arbitration concern goes out the window if New Era is not the arbitrator. And so here we have a contract that makes very clear that it contemplates that it still wants to do arbitration even if it's not mass arbitration. It's going to be normal arbitration with either fair claims or a mutually agreed arbitrator. And then with respect to the case citations, I think you all were asking a question about due process and whether – how does the law deal with the situation where the arbitrator is being asked to adjudicate the validity of their own rules? I would just point the court to three California cases that are directly on point. First is the SandQuest case. One, Cal 5th, 260, expressly addresses this scenario. Second is the Thierry case, T-I-R-I, 171. Cal reported a third at 635, addresses this scenario. And then finally, the Anderud case, 221, Cal reported a third at 238 to 239. All these cases, as my friend, Mr. Postman, I think correctly conceded, all those cases say that that kind of concern is not a reason not to enforce an arbitration agreement. Thank you, Your Honors. Thank you. Thank you both for your excellent advocacy and briefing. We appreciate it very much. We'll take this case under advisement and stand in recess. All rise.
judges: FLETCHER, CHRISTEN, VANDYKE